**Electronically Filed
Supreme Court
SCWC-30444
21-JAN-2015
10:15 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

═══════════════════════════════════════════════════════════

SCWC-30444
(ICA NO. 30444; CIVIL NO. 09-1-2488)

(CASE NO. CU-10-278)

STATE OF HAWAI'I, CITY AND COUNTY OF HONOLULU;
COUNTY OF HAWAI'I; COUNTY OF MAUI; COUNTY OF KAUA'I;
HAWAI'I HEALTH SYSTEMS CORPORATION; AND THE JUDICIARY,
Respondents/Complainants-Appellees-Appellees,

vs.

DAYTON NAKANELUA, State Director, UNITED PUBLIC WORKERS,
AFSCME, LOCAL 646, AFL-CIO and UNITED PUBLIC WORKERS,
AFSCME, LOCAL 646, AFL-CIO (2009-42),
Petitioners/Respondents-Appellants-Appellants,

and

HAWAI'I LABOR RELATIONS BOARD; JAMES B. NICHOLSON; SESNITA A.D.
MOEPONO; and ROCK B. LEY, Respondents/Agency-Appellees-
Appellees.

-----------------------

(CASE NO. CE-10-726)

UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL-CIO,
Petitioner/Complainant-Appellant-Appellant,

vs.

NEIL DIETZ, Chief Negotiator, Office of
Collective Bargaining, State of Hawaiʻi (2009-043),
Respondent/Respondent-Appellee-Appellee,

and

HAWAIʻI LABOR RELATIONS BOARD; JAMES B. NICHOLSON; SESNITA A.D.
MOEPONO; and ROCK B. LEY, Respondent/Agency-Appellees-Appellees.

-----------------------------------------------------------------

SCWC-30568
(ICA NO. 30568; S.P. NO. 09-1-0305)

UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL-CIO,
Petitioner/Union-Appellee, Cross-Appellant,

vs.

STATE OF HAWAIʻI; THE JUDICIARY; HAWAIʻI HEALTH SYSTEMS
CORPORATION, Respondents/Employers-Appellants, Cross-Appellees,

and

CITY AND COUNTY OF HONOLULU (2009-044),
Respondent/Employer-Appellee.
-----------------------------------------------------------------

SCWC-10-0000166
(CAAP-10-0000166; CIVIL NO. 10-1-0323)

(CASE NO. CU-10-278)

STATE OF HAWAIʻI, CITY AND COUNTY OF HONOLULU;
COUNTY OF HAWAIʻI; COUNTY OF MAUI; COUNTY OF KAUAʻI;
HAWAIʻI HEALTH SYSTEMS CORPORATION; AND THE JUDICIARY,
Respondents/Complainants-Appellees-Appellees,

vs.

DAYTON NAKANELUA, State Director, UNITED PUBLIC WORKERS,
AFSCME, LOCAL 646, AFL-CIO, AND UNITED PUBLIC WORKERS,
AFSCME, LOCAL 646, AFL-CIO (2009-042),
Petitioners/Respondents-Appellants-Appellants,

2

and

HAWAIʻI LABOR RELATIONS BOARD; JAMES B. NICHOLSON; SISNITA A.D. MOEPONO; and ROCK B. LEY, Respondents/Agency-Appellees-Appellees.

----------------------

(CASE NO. CE-10-726)

UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL-CIO, Petitioner/Complainant-Appellant-Appellant,

vs.

NIEL DIETZ, Chief Negotiator, Office of Collective Bargaining, State of Hawaiʻi (2009-043), Respondent/Respondent-Appellee-Appellee,

and

HAWAIʻI LABOR RELATIONS BOARD; JAMES B. NICHOLSON; SISNITA A.D. MOEPONO; and ROCK B. LEY, Respondents/Agency-Appellees-Appellees.

SCWC-30444, SCWC-30568, AND SCWC-10-0000166
(ICA NOS. 30444, 30568, AND CAAP-10-0000166;
CIV. NO. 09-1-2488, S.P. NO. 09-1-0305, AND CIV. NO. 10-1-323)

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS

JANUARY 21, 2015

RECKTENWALD, C.J., NAKAYAMA, POLLACK, AND WILSON, JJ, AND CIRCUIT JUDGE TRADER, IN PLACE OF McKENNA, J., RECUSED

OPINION OF THE COURT BY RECKTENWALD, C.J.

This appeal requires us to determine which tribunal--

the Hawaiʻi Labor Relations Board (HLRB) or the circuit court--

had jurisdiction to resolve a labor dispute regarding the selection of a neutral arbitrator.

The dispute arose out of a negotiation between the State of Hawaiʻi and other governmental entities (collectively, "the State") and United Public Workers (UPW) to renew and modify a collective bargaining agreement (CBA). Because the State and UPW could not reach an agreement, the HLRB declared an impasse pursuant to Hawaiʻi Revised Statutes (HRS) § 89-11. When the parties failed to resolve the impasse within twenty days, HRS § 89-11 then mandated that they go through an impasse procedure culminating in arbitration.

The parties agreed to a process by which they would select a neutral arbitrator. Unfortunately, they were unable to do so, and each side then filed a prohibited practice complaint accusing the other of undue delay and bad faith in carrying out the impasse procedure. The HLRB determined that both parties had committed prohibited practices by their wilful failure to complete the arbitrator selection process, and ordered the American Arbitration Association (AAA) to select the neutral arbitrator.

The dispute then moved to circuit court, where the parties filed three separate cases challenging the actions of the HLRB. In one action, the UPW filed a motion to compel

4

arbitration; the circuit court denied the motion after concluding that the HLRB had exclusive original jurisdiction over the matter because it involved prohibited practices under HRS § 89-14.[1]  The other two actions challenged HLRB's finding of prohibited practices and its ordering of the AAA to select the neutral arbitrator; the circuit court affirmed the HLRB's rulings in both cases.[2]

On appeal, the UPW contended that the circuit court had jurisdiction over the dispute regarding the selection of the arbitrator under the Hawai'i Uniform Arbitration Act, HRS chapter 658A.  The Intermediate Court of Appeals (ICA) disagreed, concluding that the HLRB had exclusive original jurisdiction under HRS § 89-14 since the dispute involved allegations of the prohibited practices and, to the extent there was a conflict between the jurisdictional provisions of HRS chapters 89 and 658A, the former takes precedence.  State v. Nakanelua, 132 Hawai'i 492, 323 P.3d 136 (App. 2014).  The UPW challenges that ruling and other aspects of the ICA's opinion.

Thus, we must decide whether the HLRB or the circuit court had jurisdiction to resolve the dispute over the selection

---

[1]     The Honorable Sabrina S. McKenna, Gary W.B. Chang, and R. Mark Browning presided.

[2]     The Honorable Karl K. Sakamoto presided.

5

of the arbitrator.  Although we conclude that the HLRB had jurisdiction under HRS chapter 89, our reasoning differs from that of the ICA.  The arbitration at issue here was required by statute as part of the legislatively mandated process for resolving impasses in collective bargaining.  In contrast, the provisions of HRS chapter 658A apply to situations in which the parties voluntarily agree to engage in arbitration.  Thus, HRS chapter 658A is simply not applicable to this case, and it is not necessary to determine whether the HLRB's jurisdiction takes precedence over that of the circuit court.

Except as noted below, we otherwise agree with the ICA's analysis.  Accordingly, the judgment of the ICA is affirmed.

## I.  Background

The following factual background is taken from the record on appeal.

### A.  Factual background

UPW is the exclusive representative for Unit 10 employees, who are "Institutional, health, and correctional workers[.]"  HRS § 89-6 (2012).  In 2008, UPW entered into negotiations with the State of Hawai'i, the Hawai'i Health Systems Corporation, the Judiciary, the City and County of Honolulu, County of Hawai'i, County of Maui, and County of Kaua'i

(collectively, the "State") to renew and modify the Unit 10 CBA covering the period from July 1, 2009 to June 30, 2011.

The parties could not reach agreement on the terms of the CBA. As a result, on February 2, 2009, the HLRB issued Order No. 2576, pursuant to HRS § 89-11(c)(2),[3] declaring an impasse and appointing a mediator to assist the parties in resolving the dispute.

Because mediation was unsuccessful, and the parties still had not resolved the impasse, on March 3, 2009, UPW and the State entered into the following memorandum of agreement (MOA), setting forth an alternative impasse procedure pursuant to HRS § 89-11(a)[4]:

---

[3]   HRS § 89-11(c) (2012) provides, in pertinent part:

An impasse over the terms of an initial or renewed agreement and the date of impasse shall be as follows:

. . .

(2) If neither party gives written notice of an impasse and there are unresolved issues on January 31 of a year in which the agreement is due to expire, the board shall declare on January 31 that an impasse exists and February 1 shall be the date of impasse.

[4]   HRS § 89-11(a) (2012) provides that:

A public employer and an exclusive representative may enter, at any time, into a written agreement setting forth an alternate impasse procedure culminating in an arbitration decision pursuant to subsection (f), to be invoked in the event of an impasse over the terms of an initial or renewed agreement. The alternate impasse procedure shall specify whether the parties desire an arbitrator or arbitration panel,

(continued…)

MEMORANDUM OF AGREEMENT
Alternate Impasse Procedure for Unit 10

This MEMORANDUM OF AGREEMENT is entered into this 3rd day of March 2009, by and between the United Public Workers, AFSCME, Local 646 AFL-CIO hereinafter the "Union," and the State of Hawaii, the Judiciary, the Hawaii Health Systems Corporation, and the City and County of Honolulu, hereinafter the "Employer."

Pursuant to subsection 89-11(a), Hawaii Revised Statutes; the Union and the Employer agree to the following alternate impasse procedure for the successor collective bargaining agreements, effective July 1, 2009, covering employees in bargaining unit 10.

1.   **February 1, 2009** — Impasse is declared by the Hawaii Labor Relations Board.

2.   **February 2, 2009 to June 22, 2009** — Mediation.

3.   **June 23, 2009** — HLRB notifies the parties that the impasse will be submitted to a 3-member arbitration panel.  Two panel members are selected by the parties (i.e., one by the Employer and one by the Union).  The neutral third member is the chair of the arbitration panel and is selected by mutual agreement of the parties.

4.   **July 6, 2009** — Deadline to select a neutral arbitrator.  HLRB requests a list of arbitrators from AAA.  In the event the parties fail to select the neutral third member of the panel by this date, HLRB will request a list of 5 qualified arbitrators from AAA.  The neutral is selected from such list.

     Selection & Appointment of Neutral Arbitrator is made within 5 working days after receipt of

_____
(continued…)

how the neutral arbitrator is to be selected or the name of the person whom the parties desire to be appointed as the neutral arbitrator, and other details regarding the issuance of an arbitration decision.  When an impasse exists, the parties shall notify the board if they have agreed on an alternate impasse procedure.  The board shall permit the parties to proceed with their procedure and assist at times and to the extent requested by the parties in their procedure. . . .

8

AAA list. The parties alternately strike names from the list until a single name is left. HLRB immediately appoints such person as the neutral arbitrator and chairperson of the arbitration panel. (Additional time is provided to allow AAA to submit the list of arbitrators.)

5. **August 4, 2009** — Deadline for submission of written final positions by each party to the members of the arbitration panel and a copy to the other party.

6. **September 11, 2009** — Commencement of arbitration hearing. (Panel members "are encouraged to assist the parties in a voluntary resolution of the impasse through mediation to the extent practicable throughout the entire arbitration period until the date the panel is required to issue its arbitration decision.")

7. **October 12, 2009** — Receipt of transcripts by panel and parties.

8. **November 12, 2009** — Receipt of closing briefs by panel members; and exchange by parties.

9. **November 12, 2009** — Conclusion of the arbitration hearing. (About 6 to 7 working days are needed to complete the hearing. Transcripts, if requested, are usually made available 15 or more calendar days after the hearing ends. The arbitration panel usually allows the parties to submit post-hearing briefs within 30 calendar days after receipt of transcripts. Hence, the panel and the parties should have a clear understanding that the receipt date of the post-hearing briefs by the panel members shall be the conclusion of the arbitration hearing.)

10. **December 11, 2009** — Issuance of the preliminary draft of the arbitration decision which is made within 30 days after the conclusion of the hearing. A majority of the panel must reach a decision pursuant to HRS subsection 89-11(f) on all provisions that each party proposed in its respective final position for inclusion in the final agreement and transmit a preliminary draft of it decision to the parties. The parties must review the preliminary draft for completeness, technical correctness, and clarity and may <u>mutually</u> submit to the panel any desired changes or adjustments that must be

>       incorporated in the final draft of the
>       arbitration decision.
>
> 11.   **December 28, 2009** is the date of issuance of a
>       final arbitration decision.
>
> 12.   The authorized representatives for the parties
>       regarding matters covered herein are:
>
>       a.    Marie Laderta, Employer Representative,
>             and
>       b.    Dayton Nakanelua, Union Representative
>
> 13.   Time frames provided in the Memorandum of
>       Agreement may be modified by mutual agreement
>       of the parties.

(Emphasis in original).

As indicated in the MOA, HLRB would request a list of arbitrators from the AAA. From this list, the parties were to select a three-member arbitration panel that would consist of an arbitrator chosen by each of the parties and a "neutral arbitrator" selected by mutual agreement of the parties. If the parties could not select the neutral arbitrator by July 6, 2009, the HLRB would request the AAA to provide a list of five arbitrators, then the parties would alternate striking names from the list and designate the last remaining name as the neutral arbitrator. UPW and the State designated Clifford Uwaine and Stanley Shiraki, respectively, as arbitrators. On July 15, 2009, the AAA provided a list of five potential neutral arbitrators. The deadline to select the neutral arbitrator was initially scheduled for five days after the AAA provided the

list, but the parties mutually agreed to extend the deadline to July 28, 2009.

In a July 29, 2009 letter to the HLRB, Laderta, the State's representative, alleged that she had attempted on numerous occasions from July 15, 2009 until July 28, 2009 to contact UPW's representative, Nakanelua, regarding the selection of the neutral arbitrator, but Nakanelua never returned her calls. The day before Laderta's letter, Herbert Takahashi, counsel for UPW, wrote to the State indicating that he represented UPW in the selection process and requested that the State stop its attempts to contact Nakanelua.

In response, on July 31, 2009, James Halvorson, deputy attorney general, wrote to Takahashi to inform him that Halvorson would be representing the "Employer." Halvorson also requested that Takahashi call him immediately to begin the process of selecting the neutral arbitrator.

On August 3, 2009, Takahashi wrote to Halvorson asking him to identify which "employer" Halvorson represented, and also asking for verification of Halvorson's "authority to represent anyone other than Governor Lingle." On August 6, Halvorson replied by letter that he represented the "employer in the upcoming Unit 10 interest arbitration" and that Takahashi should contact him to begin the selection process. The next day, in a

11

letter dated August 7, 2009, Takahashi stated that Halvorson's August 6, 2009 letter was not responsive because it "does not indicate apparent or actual authority to act for the employer group."

On August 10, 2009, Halvorson requested the HLRB's assistance because the "selection process has yet to proceed due to delays by UPW's counsel."

Halvorson also indicated that the delay appeared to compromise the availability of the arbitrator eventually selected for the September 11, 2009 start date for the Unit 10 arbitration.[5]  The HLRB held a hearing on August 13, 2009, pursuant to Halvorson's request, at which Halvorson proposed to initiate the striking of names, but Takahashi refused.  The next day, Takahashi sent Halvorson a letter agreeing to the State striking first, but "[w]ithout waiving the UPW's right to contest [Halvorson's] authority to represent the 'employer[.]'"

The State struck its first name from the AAA list on August 18, 2009.  UPW followed on August 20, 2009 by striking another name off the list.

_____

[5]     Included in Halvorson's letter to the HLRB was an August 7, 2009 email from the AAA, stating that no appointment of an arbitrator had been made, and that none of the five arbitrators would likely be able to accommodate the September 11, 2009 commencement of the arbitration.

On August 21, 2009, the AAA sent an email to the parties, stating that it was setting an August 25, 2009 deadline for the parties to select the neutral arbitrator.  The email warned that if the parties did not select a neutral arbitrator by the deadline, "the [AAA] shall administratively appoint an Arbitrator at that time."

On August 24, 2009, Takahashi replied to the AAA, stating that UPW objected to the August 25, 2009 deadline because the MOA "does not authorize AAA to administratively appoint an arbitrator."  Takahashi added, "There is currently a dispute over who the 'employer' is, and whether the selection of arbitrators by the State . . . is improper."

On August 26, 2009, Halvorson sent another letter to Takahashi stating:

> As you know, the March 3, 2009 MOA concerning the alternate impasse procedure between the UPW and the Employer provides that the selection and appointment of neutral arbitrator shall ·be made within 5 working days after receipt of AAA list.  Since July 15, 2009, the Chief Negotiator for the public employer made several attempts to contact the UPW State Director to no avail.
>
> On July 28, 2009, you wrote a letter informing the employer that you would be making the selection of the neutral arbitrator.  However, to date you have stonewalled any attempts to select an arbitrator.  Despite my letter to you on July 31, 2009 requesting the selection of an arbitrator, and another letter dated August 6, 2009, as well as request for assistance made to the Board and a subsequent meeting at the Board on August 13, 2009, and me making the first strike on August 18, 2009, you have delayed the selection by taking one week to make your strike.

In addition, your August 24, 2009, letter to AAA shows you are not acting in good faith when you informed AAA about a dispute over who the "employer" is and whether my selection of the arbitrator is improper.

Your conduct throughout this process shows bad faith. Accordingly, we take the position that UPW waived its right to participate in the interest arbitration, or at a minimum UPW has waived its right to strike names from the list of arbitrators and the Employer is authorized to unilaterally select from the list of neutral arbitrator [sic]. We are seeking this relief through a prohibited practice complaint I filed on Monday, August 24, 2009.

The next day, Takahashi sent a response letter to the State. He warned that, "If you refuse to exercise the 'second' strike forthwith appropriate relief will be sought for willful violation of the memorandum of agreement."

## B.    Prohibited practice complaints in the HLRB

On August 24, 2009, the State filed a prohibited practice complaint (CU-10-278) in the HLRB, alleging that UPW had "willfully violated HRS Section 89-13(b)(4)[6] by refusing to comply with" the alternate impasse procedure agreed to pursuant

---

[6]    HRS § 89-13 (2012) lists various prohibited practices, including:

(b) It shall be a prohibited practice for a public employee or for an employee organization or its designated agent wilfully to:

. . .

(3) Refuse to participate in good faith in the mediation and arbitration procedures set forth in section 89-11; [or]

(4) Refuse or fail to comply with any provision of this chapter[.]

to HRS § 89-11. The State sought an order declaring that UPW had waived its right to participate in the selection process and authorizing the State to unilaterally select the neutral arbitrator from the AAA list.

On August 31, 2009, UPW filed its own prohibited practice complaint (CE-10-726), alleging that "on and after August 28, 2009 Laderta ha[d] wilfully refused to proceed with the striking process as required by paragraph 4 of the [MOA]."

In its prohibited practice complaint case, the State filed a motion for interlocutory relief requesting a declaratory order that the UPW violated the MOA, committed a prohibited practice, and had waived its right to either participate in the interest arbitration set for September 11, 2009 or waived its right to participate in the selection of the neutral arbitrator. The State's accompanying memorandum contended that UPW's conduct was dilatory and amounted to bad faith. The State also requested that the HLRB dismiss UPW's prohibited practice complaint against Laderta.

On September 10, 2009, UPW filed a motion to dismiss the State's complaint and in the alternative for summary judgment. UPW argued the State committed a prohibited practice in violation of HRS § 89-13(a)(8) by refusing to complete its second strike. UPW requested that the HLRB grant its complaint

15

as a matter of law, dismiss the State's complaint, and compel the State to complete the striking process and proceed with the arbitral process under the MOA.

The HLRB consolidated the complaints on September 16, 2009. On September 25, 2009, the HLRB issued Order No. 2640. The order granted the State's motion for interlocutory relief in CU-10-278. The HLRB first concluded that it had jurisdiction over the subject matter of the consolidated cases, pursuant to HRS § 89-14,[7] because the controversies concerned prohibited practices. Next, the HLRB found that, "[t]o date, the parties have not selected the neutral arbitrator. Yet, since July 15, 2009, the date of the list from AAA, the parties managed to find the time to" correspond with each other and file various pleadings with the HLRB and the courts. The HLRB thus found both parties had been responsible for the undue delay in the selection of the neutral arbitrator.

_____

[7]     HRS § 89-14 (2012) provides that:

Any controversy concerning prohibited practices may be submitted to the board in the same manner and with the same effect as provided in section 377-9; provided that the board shall have exclusive original jurisdiction over such a controversy except that nothing herein shall preclude (1) the institution of appropriate proceedings in circuit court pursuant to section [89-12(c)] or (2) the judicial review of decisions or orders of the board in prohibited practice controversies in accordance with section 377-9 and chapter 91. All references in section 377-9 to "labor organization" shall include employee organization.

The HLRB then explained that, because the State moved for interlocutory relief, the HLRB would decide the motion by analyzing whether the employer is likely to prevail at trial. Applying this analysis, the [HLRB] concluded that, "given the history of events regarding the interest arbitration procedure, the employer is likely to prevail on the merits that the UPW committed a prohibited practice by wilfully failing to comply with the . . . alternate impasse procedure authorized by HRS § 89-11 and entered into by the parties."  Adding that the balance of irreparable harm and public interest supported interlocutory relief because both parties' wilful refusal to comply with the selection process put the interests of both parties and the Unit 10 public employees at risk, the HLRB thereby ordered the AAA to select the neutral arbitrator.  Soon thereafter, the AAA selected Jonathan Dworkin as the neutral arbitrator.

On February 9, 2010, the HLRB issued Order No. 2686. Based on the same findings it made in Order No. 2640, the HLRB held that both the State and UPW committed prohibited practices by their wilful refusal to complete the arbitrator selection process.  As a consequence, the HLRB ordered "that a copy of this Order be posted by all parties on their website and in conspicuous places where employees of Unit 10 assemble, and to

17

keep the copies posted for a period of 60 days from the date of posting."  The HLRB imposed no other obligations on either party.

## C.    Circuit court proceedings

### 1.    Case No. SCWC-30444 (Appeal from HLRB Order No. 2640)

On October 23, 2009, UPW filed a timely notice of appeal in the circuit court of the HLRB's Order No. 2640.[8]  In UPW's opening brief, it argued that jurisdiction over the selection of an arbitrator rested with the circuit court pursuant to chapter 658A; the HLRB exceeded its statutory authority by ordering the AAA to select a neutral arbitrator because "[o]nce the parties have entered into an alternative impasse procedure which specifies how a neutral arbitrator is to be selected, the [HLRB] is powerless to implement any other requirement" besides what the MOA authorized; and the HLRB abused its discretion by granting interlocutory relief to a party that refused to abide by the MOA.

In the State's answering brief, it argued that pursuant to HRS § 89-14, the HLRB had exclusive jurisdiction over the State's motion for interlocutory relief because it involved prohibited practices.  The State explained that chapter

---

[8]    The Honorable Karl K. Sakamoto presided.

18

658A applies to "agreements to arbitrate," but not an interest arbitration or prohibited practice under chapter 89. The State next contended that the HLRB did not exceed its authority when it ordered the AAA to select a neutral arbitrator because HRS § 89-11 empowers the HLRB with broad discretion to assist the parties in resolving their impasse. The State added that the HLRB did not abuse its discretion in ordering the AAA to select the neutral arbitrator, given the parties' inability to timely select the arbitrator themselves.

The HLRB's answering brief argued that the circuit court lacked jurisdiction over the appeal of Order No. 2640 because it was not a final order or an appealable preliminary ruling within the meaning of HRS § 91-14. The HLRB pointed to its later Order No. 2686 as the "final order" in the consolidated prohibited practices case. The HLRB also defended its choice of remedy in Order No. 2640 by pointing to substantial evidence that the parties wilfully delayed the alternate impasse process.

On February 25, 2010, the State filed a supplemental answering brief to inform the court that UPW had moved to confirm and enforce the arbitration award in S.P. No. 09-1-0305, thereby rendering UPW's appeal moot in Case No. 30444.

19

On April 1, 2010, the circuit court issued its decision and order affirming the HLRB's Order No. 2640.  With regard to jurisdiction, the circuit court held that the HLRB had exclusive jurisdiction pursuant to chapter 89 because the matter involved prohibited practice complaints.  The circuit court also held that the HLRB properly assisted the parties pursuant to HRS § 89-11 in selecting the neutral arbitrator, given the parties' failure to proceed with their alternate impasse procedure.

The circuit court entered final judgment on April 1, 2010.  UPW timely filed a notice of appeal in the ICA on April 16, 2010.

### 2.    Case No. SCWC-10-166 (Appeal from HLRB Order No. 2686)

In Case No. CAAP-10-166, UPW and the State timely appealed in the circuit court the HLRB's Order No. 2686, which found that the State and UPW had both committed prohibited practices.[9]

In UPW's opening brief, it insisted there was no evidence to support the HLRB's finding that it committed a prohibited practice.  UPW added that the State was the party that "wilfully" failed to adhere to the selection process when it refused to strike another name from the AAA list.

---

[9]    The Honorable Karl K. Sakamoto presided.

20

The State's opening brief also challenged the HLRB's finding that the State wilfully refused to complete the arbitration process in a timely manner. The State explained that "the breach of the MOA by the UPW discharged and excused the [State] from any obligation to perform."

The HLRB filed answering briefs to both UPW's and the State's opening briefs. In the answering brief to UPW, the HLRB maintained that it correctly determined the union committed a wilful violation of HRS § 89-11; and that it was not an abuse of discretion for it to require the parties to post Order No. 2686 on their website for sixty days. The HLRB also noted that the State was not excused from its obligation to perform under the agreement just because UPW materially breached the contract first.

The circuit court issued its order affirming the HLRB's Order No. 2686, and determining that the HLRB did not clearly err in finding both parties had committed prohibited practices.

The circuit court entered final judgment the same day. UPW timely filed a notice of appeal.

3.    **Case No. SCWC-30568 (Special Proceeding No. 09-1-0305)**

Meanwhile, on September 9, 2009, UPW filed a motion to compel arbitration in the circuit court (S.P. No. 09-1-0305

21

EEH).[10]  UPW asserted in its motion that the circuit court had jurisdiction pursuant to chapter 658A.

On October 21, 2009, the circuit court issued an order granting in part and denying in part the motion to compel arbitration.  The circuit court determined that "the [HLRB] has subject matter jurisdiction over a prohibited practice controversy pursuant to [HRS § 89-14]."  Accordingly, the circuit court ruled that it "lacks subject matter jurisdiction over the issues presented regarding prohibited practices, and in the alternative, if this Court has jurisdiction, the Court finds under the primary jurisdiction doctrine the [HLRB] should first address the issues presented."

On January 14, 2010, Dworkin and the other two arbitrators issued an opinion and award.  On February 19, 2010, UPW filed a motion to confirm and enforce the arbitration award. The circuit court issued an order on May 18, 2010, granting UPW's motion to confirm and enforce arbitration award.  The circuit court entered judgment the same day.

On July 7, 2010, UPW filed a motion for show cause order and for civil contempt.  The motion alleged that the May 18, 2010 order incorporated the January 14, 2010 arbitration

---

[10]    The Honorable Sabrina S. McKenna, Gary W.B. Chang, and R. Mark Browning presided.

award, which required UPW and the State "to meet and confer, without undue delay, and draft language for the 2009-2011 agreement," but that the State had refused to meet and confer with UPW since the May 18, 2010 order.  UPW requested that the circuit court find the State in civil contempt and impose judicial sanctions, including civil fines, attorney's fees and costs, and other appropriate relief.

The circuit court denied UPW's motion, finding that there was "no clear and convincing evidence that the [State] failed to comply with [the circuit court's May 18, 2010 order]." However, the court ordered the State and UPW to meet and confer "to draft such language for the 2009-2011 Agreement as is necessary and appropriate to give effect to the interest arbitration award issued on January 14, 2010[.]"

The State timely filed a notice of appeal.  UPW timely filed a cross-appeal.

4.    **Consolidated ICA Appeal**

In its opening briefs[11] to the ICA, UPW argued "[t]he Circuit Court erred on the question of whether the court or the [HLRB] has subject matter jurisdiction to determine a dispute over a selection of the neutral arbitrator to serve in the unit

_____

[11]    Because the parties filed multiple briefs in all three cases in the ICA, the relevant arguments are consolidated here.

23

arbitration." UPW contended that subject matter jurisdiction over the selection of an arbitrator under an arbitration agreement rested with the circuit court under chapter 658A "because the chapter is both the more recent and a more specific statute on the selection process of an arbitrator compared to Chapter 89." Additionally, UPW insisted that HRS § 658A-11[12] required the circuit court to compel arbitration according to the terms set forth in the MOA. UPW also argued that, "[b]y failing to grant the motion for civil contempt, the circuit court in effect withheld the enforcement of the arbitration award, contrary to the intent and purpose of [chapter 658A] and as such the circuit court erred as a matter of law." Finally, UPW contended that "[t]he Circuit Court and the [HLRB] erred as a matter of law in finding 'willful' violations by UPW in Case CU-10-278[.]"

In its answering briefs,[13] the HLRB argued the circuit court was correct in concluding that the HLRB had jurisdiction

_____

[12] HRS § 658A-11(a) (Supp. 2001) provides in relevant part that:

> If the parties to an agreement to arbitrate agree on a method for appointing an arbitrator, that method shall be followed, unless the method fails. If the parties have not agreed on a method, the agreed method fails, or an arbitrator appointed fails or is unable to act and a successor has not been appointed, the court, on motion of a party to the arbitration proceeding, shall appoint the arbitrator.

[13] The HLRB did not file any briefs in CAAP-30568.

24

over the prohibited practice complaints.  The HLRB then insisted that substantial evidence supported its prohibited practice determinations.  Regarding Order No. 2640, which directed the AAA to select the neutral arbitrator, the HLRB contended that it properly exercised its broad powers under HRS § 89-5(i) to assist the parties in resolving their impasse by ordering the selection of the neutral arbitrator.

In the State's answering briefs, it argued that the HLRB had exclusive original jurisdiction to resolve the arbitration dispute under chapter 89.  The State also contended that the case was mooted by both parties' acceptance of the interest arbitration decision.

In a published opinion, the ICA first concluded that "the issues raised by UPW relating to the selection of the neutral arbitrator are moot because there is no live controversy between UPW and [the State] regarding the terms of the Arbitration Award[.]"  The ICA noted that neither party challenged the award, and UPW even moved to have the award confirmed.  The ICA also determined that UPW's challenge to the HLRB's Order No. 2686 finding both parties had committed prohibited practices was moot.  The ICA reasoned that the HLRB was no longer seeking judicial enforcement of the order, so

25

neither party had any continuing obligations arising from the order.

The ICA nevertheless held that, under the public interest exception to the mootness doctrine, it would address the following two issues:  (1) "whether the HLRB or the Circuit Court had original jurisdiction to resolve the dispute over the selection of the neutral arbitrator"; and (2) "whether the HLRB exceeded its authority in issuing its order for interlocutory relief" directing the AAA to select a neutral arbitrator.

The ICA held that the HLRB, not the circuit court, had jurisdiction over the selection of the neutral arbitrator.  In support of this result, the ICA first concluded that the HLRB had exclusive original jurisdiction over the arbitration selection dispute because, under HRS § 89-14, the HLRB had jurisdiction over any "controversy concerning prohibited practices."  The ICA then proceeded to address UPW's contention that the circuit court had exclusive original jurisdiction over the matter pursuant to chapter 658A.  Although the ICA appeared to conclude that chapter 658A did not cover statutorily mandated arbitration, the ICA stated:

> [W]e need not resolve the question of whether HRS
> Chapter 658A applies to interest arbitrations under
> HRS Chapter 89.  This is because even if the MOA
> qualifies as an "agreement to arbitrate" that is
> subject to the provisions of HRS Chapter 658A, the
> exclusive original jurisdiction granted to the HLRB
> over controversies concerning prohibited practices by

26

> HRS § 89—14 would supersede HRS Chapter 658A. HRS § 89—19 (2012) explicitly states that the provisions of HRS Chapter 89 "shall take precedence over all conflicting statutes concerning this subject matter and shall pre-empt all contrary local ordinances, executive orders, legislation, or rules adopted by the State[.]" To the extent that there may be a conflict between the jurisdictional provisions of HRS Chapters 89 and 658A, Chapter 89 takes precedence over Chapter 658A.

(Footnote omitted).

Next, the ICA held that the HLRB did not exceed its authority in ordering interlocutory relief that differed from the arbitrator selection procedures set forth in the MOA. The ICA explained that the HLRB is granted broad statutory authority under HRS § 89-5(i) to determine how to resolve prohibited practice disputes. And, given the parties' inability to timely select the neutral arbitrator, the HLRB did not abuse its discretion in using its authority to direct the AAA to do so. Finally, the ICA held that the circuit court did not err in denying the motion for civil contempt. The ICA explained that the motion involved a controversy concerning prohibited practices, thus, "the Circuit Court lacked jurisdiction to decide the Motion for Civil Contempt."

Accordingly, the ICA affirmed the circuit court's April 1, 2010 Final Judgment in Appeal No. 30444, affirmed the circuit court's May 18, 2010 Final Judgment but vacated its August 25, 2010 Order Denying Motion for Civil Contempt in

Appeal No. 30568, and affirmed the circuit court's November 10, 2010 Final Judgment in Appeal No. CAAP-10-0000166.

The ICA entered its judgment on appeal on April 4, 2014.  UPW timely filed its application for certiorari on June 3, 2014.  The State filed a response on June 17, 2014.

## II.  Standards of Review

### A.  Subject matter jurisdiction

> The existence of jurisdiction is a question of law that we review de novo under the right/wrong standard.  Questions regarding subject matter jurisdiction may be raised at any stage of a cause of action.  When reviewing a case where the circuit court lacked subject matter jurisdiction, the appellate court retains jurisdiction, not on the merits, but for the purpose of correcting the error in jurisdiction.  A judgment rendered by a circuit court without subject matter jurisdiction is void.

Riethbrock v. Lange, 128 Hawaiʻi 1, 11, 282 P.3d 543, 553 (2012) (citing Lingle v. Hawaiʻi Gov't Emps. Ass'n, AFSCME, Local 152, 107 Hawaiʻi 178, 182, 111 P.3d 587, 591 (2005)).

"Accordingly, a court's decision to invoke the primary jurisdiction doctrine is reviewed de novo as well.  If the court determines that the primary jurisdiction doctrine applies, the court, in its discretion, may determine whether to stay the litigation or dismiss without prejudice."  United Pub. Workers, AFSCME, Local 646, AFL-CIO v. Abercrombie, 133 Hawaiʻi 188, 195, 325 P.3d 600, 607 (2014) (quoting Pac. Lightnet, Inc. v. Time

28

Warner Telecom, Inc., 131 Hawai'i 257, 275, 318 P.3d 97, 115 (2013)).

**B.  Mootness**

"[M]ootness is an issue of subject matter jurisdiction.  Whether a court possesses subject matter jurisdiction is a question of law reviewable de novo."  Hamilton ex rel. Lethem v. Lethem, 119 Hawai'i 1, 4-5, 193 P.3d 839, 842-43 (2008) (internal quotation marks omitted) (quoting Kaho'ohanohano v. Dep't of Human Servs., 117 Hawai'i 262, 281, 178 P.3d 538, 557 (2008)).

### III.  Discussion

**A.  Although the ICA erred in concluding that the finding of prohibited practices in Order No. 2686 was moot, the finding was nevertheless supported by substantial evidence**

A threshold issue in the instant case is to what extent UPW's claims are moot.  The ICA determined the following issues were moot:  (1) the HLRB's Order No. 2686 finding that both the State and UPW committed prohibited practices; and (2) the selection of the neutral arbitrator.

In general, "this court does not have jurisdiction to decide abstract propositions of law or moot cases[.]"  Lathrop v. Sakatani, 111 Hawai'i 307, 312, 141 P.3d 480, 485 (2006) (internal quotation marks and brackets omitted) (quoting Wong v. Bd. of Regents, Univ. of Haw., 62 Haw. 391, 395, 616 P.2d 201,

29

204 (1980)). "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." Wong, 62 Haw. at 394-95, 616 P.2d at 204. Stated otherwise,

> [t]he mootness doctrine is said to encompass the circumstances that destroy the justiciability of a suit previously suitable for determination. Put another way, the suit must remain alive throughout the course of litigation to the moment of final appellate disposition. . . . The doctrine seems appropriate where events subsequent to the judgment of the trial court have so affected the relations between the parties that the two conditions for justiciability relevant on appeal--adverse interest and effective remedy--have been compromised.

Lathrop, 111 Hawaiʻi at 312-13, 141 P.3d at 485-86 (quoting Wong, 62 Haw. at 394, 616 P.2d at 203-04).

The ICA erred in concluding that the HLRB's Order No. 2686--finding that UPW and the State both committed prohibited practices--was moot. To establish that Order No. 2686 was moot, the HLRB points out that the order only required that a copy of the order "be posted by all parties on their website and in conspicuous places where employees of Unit 10 assemble, and to keep the copies posted for a period of 60 days from the date of posting." Apart from this temporary obligation, the HLRB contends that Order No. 2686 imposed no other sanctions or

30

directives for which this court could grant relief, or for which the HLRB could continue to seek enforcement, thus, the order is moot.

However, the HLRB's argument fails to take into account that an agency such as the HLRB can give consideration to its past decisions when determining future prohibited practice complaints. For example, in Sun Oil Co. of Pennsylvania v. N.L.R.B., 576 F.2d 553, 554-55 (3d Cir. 1978), a company petitioned for review of two decisions and orders by the National Labor Relations Board (NLRB) finding that the company committed unfair labor practices. The United States Court of Appeals for the Third Circuit denied the NLRB's motion to dismiss the case for mootness. Id. at 558 n.3. The court reasoned that the case was not moot because:

> important collateral consequences may flow from the [NLRB's] order unless the unfair labor practice violations are expunged . . . . Because the [NLRB] often gives consideration to past misconduct in determining current claims of unfair labor practices, the Company has a continuing, vital interest in a clear pronouncement that they have committed no unfair labor practices in this instance.

Id. at 558 n.3.

There is nothing to preclude the HLRB, like the NLRB in Sun Oil Co., from taking into consideration past decisions when determining current prohibited practice complaints against either UPW or the State. Indeed, under HRS § 377-9(d), the HLRB

31

is authorized to assess a monetary penalty against an employer or employee based on past findings of unfair or prohibited practices. HRS § 377-9 (1993 and Supp. 2009) ("[A]n employer or employee who wilfully or repeatedly commits unfair or prohibited practices that interfere with the statutory rights of an employer or employees or discriminates against an employer or employees for the exercise of protected conduct shall be subject to a civil penalty not to exceed $10,000 for each violation."). Although HRS § 377-9(d) specifically addresses employer-employee relations, and thus does not appear to apply to a collective bargaining representative such as UPW, the provision nonetheless suggests that it is permissible for the HLRB to consider past prohibited practices decisions within the context of a collective bargaining dispute such as the one in the instant case. The HLRB has not pointed to any law that prevents it from doing so. Although Order No. 2686 no longer imposes any directives, it still presents a live controversy for which a court can provide an effective remedy. Were this court to vacate Order No. 2686, thereby expunging the finding of a prohibited practice from both UPW's and the State's employment relations record, it would relieve them from having the order used against them in later prohibited practice determinations. In sum, the HLRB's Order No. 2686 was not moot.

32

Although the ICA erred in finding the order was moot, we nevertheless affirm the ICA's judgment on this point because the HLRB's finding that UPW committed a prohibited practice is supported by substantial evidence. In Order No. 2686, the HLRB found that both parties had "wilfully failed to complete the arbitrator selection process" in violation of the MOA and chapter 89. Relevant to the HLRB's finding, the parties did not meet their initial deadline to select the arbitrator by July 22, 2009, and extended the deadline to July 28, 2009. The HLRB noted that during this time, the State's representative had tried repeatedly to contact UPW's representative to begin the selection process, but she never heard back from UPW's representative. The parties further consumed unnecessary time by corresponding by letter. As a result of both parties' conduct, neither UPW nor the State struck a name from the AAA list until August 18, 2009, and by August 24, 2009, the parties had only managed to strike only two names. The HLRB pointed out that, "Although the parties did not select the neutral arbitrator, since July 15, 2009, the date of the list from AAA, the parties managed to find the time" to correspond with each other and file various pleadings with the HLRB and the courts. Given this evidence, the HLRB did not clearly err in concluding that the parties could have completed the arbitrator selection

process if they wanted to, but, given the totality of the
circumstances, the parties' failure to do so was wilful.

**B.   The ICA did not err in concluding that issues regarding the
selection of the neutral arbitrator were moot but fell
within the public interest exception to the mootness
doctrine**

The ICA correctly concluded that issues relating to
the selection of the neutral arbitrator were moot.  As the ICA
notes, although the parties disagree about the selection of the
neutral arbitrator, they do not dispute the terms of the
arbitration award itself.  Indeed, after Dworkin was selected as
the neutral arbitrator by the AAA, and the arbitration panel
issued its decision, UPW moved the circuit court to confirm the
arbitration award.  UPW then argued on appeal that the circuit
court erred in denying UPW's motion to find the State in civil
contempt for failing to comply with the award.  Insofar as both
parties agreed to the arbitration award, the underlying
selection of the neutral arbitrator was no longer a live
controversy, thereby rendering it moot.  Moreover, both the MOA
and the 2009-2011 CBA have expired.  It is therefore unclear
what relief a court could provide regarding the selection of the
neutral arbitrator.  Accordingly, the ICA correctly concluded
that issues regarding the selection of the neutral arbitrator
were moot.

The ICA nevertheless concluded that the public interest exception to the mootness doctrine applied to two issues regarding the selection of the neutral arbitrator: "whether (1) the HLRB or the Circuit Court had jurisdiction to determine the parties' dispute over the selection of the neutral arbitrator; and (2) whether the HLRB exceeded its authority in issuing the order for interlocutory relief directing the AAA to select the neutral arbitrator." As a result, the ICA determined that it retained jurisdiction over those issues and addressed them in its opinion. The ICA was correct, as discussed below.

"When analyzing the public interest exception, this court looks to (1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question." Hamilton, 119 Hawaiʻi at 6-7, 193 P.3d at 844-45 (quoting Doe v. Doe, 116 Hawaiʻi 323, 327, 172 P.3d 1067, 1071 (2007)) (brackets omitted). The above factors support the ICA's conclusion. First, it is clear that both issues are of a public nature. Each issue concerns a CBA between public employers and the collective bargaining representative of their Unit 10 employees. See Kahoʻohanohano v. State, 114 Hawaiʻi 302, 333, 162 P.3d 696, 727 (2007) (holding that the subject appeal was of a public nature

35

because the outcome would affect all state and county employees).  Second, it is also clear that deciding the two issues would assist the HLRB in adjudicating future cases implicating similar issues, and would provide guidance to parties to comparable CBAs.  Third, without a ruling on both issues, it is likely that similar disputes would arise in the future.  For example, the issue of whether the HLRB or the circuit court has jurisdiction over an arbitration dispute has already come before this court in the past year.  See Hawaiʻi State Teachers Ass'n v. Univ. Lab. Sch. (hereinafter "HSTA"), 132 Hawaiʻi 426, 322 P.3d 966 (2014).  Given all of this, the ICA properly considered the two issues under the public interest exception.

**C.  The circuit court lacked jurisdiction over the arbitration in the instant case because chapter 658A applies to an "agreement to arbitrate" and not to statutorily mandated arbitration pursuant to HRS § 89-11(e)**

UPW argues the ICA erred in concluding the circuit court lacked jurisdiction to appoint the arbitrator.  The ICA reached the correct result, i.e., that the circuit court lacked jurisdiction, but arrived at this result through incorrect reasoning.  Specifically, the ICA correctly concluded the HLRB had exclusive original jurisdiction over the arbitration because it was a controversy concerning prohibited practices.  However,

36

the ICA decided that it "need not resolve the question of whether HRS Chapter 658A applies to interest arbitrations under HRS Chapter 89" because, under HRS § 89-19 (2012), "the exclusive original jurisdiction granted to the HLRB over controversies concerning prohibited practices by HRS § 89-14 would supersede HRS Chapter 658A."  As discussed below, because chapter 658A applies to an "agreement to arbitrate" only and not to statutorily mandated arbitration under HRS § 89-11(e), the circuit court did not have jurisdiction pursuant to chapter 658A.  The ICA therefore erred when it relied on HRS § 89-19 to resolve whether chapter 89 or chapter 658A would control because chapter 658A was inapplicable.

1.  **The HLRB had jurisdiction to determine disputes over the selection of the neutral arbitrator**

Chapter 89, entitled "Collective Bargaining in Public Employment," sets forth a specific statutory scheme that granted the HLRB jurisdiction over the impasse process in the instant case, including disputes regarding the selection of the neutral arbitrator.

Chapter 89 provides that "it is the public policy of the State to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government." HRS § 89-1(b) (2012).  One purpose of chapter 89 is "to provide

37

a rational method for dealing with disputes and work stoppages[.]"  Id. § 89-1(a) (2012).  "[T]o administer the provisions of chapters 89 and 377," and effectuate their policies, the legislature created the HLRB.  Id. § 89-1(b)(3) (2012); see also HGEA, 124 Hawaiʻi at 204, 239 P.3d at 8 (citing S. Stand. Comm. Rep. No. 597-82, in 1982 Senate Journal, at 1202)), and granted it express powers to:  "[r]esolve controversies under this chapter"; and "[c]onduct proceedings on complaints of prohibited practices by employers, employees, and employee organizations and take such actions with respect thereto as it deems necessary and proper[.]"  HRS § 89-5(i) (2012).

Under HRS § 89-14, the legislature also granted the HLRB "exclusive original jurisdiction" over "[a]ny controversy concerning prohibited practices[.]"  Pursuant to HRS § 89-13, "It shall be a prohibited practice for a public employer [or bargaining unit representative] wilfully to:  [r]efuse to participate in good faith in the mediation and arbitration procedures set forth in section 89-11; [r]efuse or fail to comply with any provision of this chapter; [or] [v]iolate the terms of a collective bargaining agreement[.]"  HRS § 89-13(a)(6)-(8); id. § 89-13(b)(3)-(5).

The legislature also set forth a specific procedure to be followed in the circumstances of this case, namely, an impasse[14] between a public employer and bargaining unit representative.  If the impasse involves critical bargaining units,[15] as it does here, HRS § 89-11 mandates that the HLRB "shall assist in the resolution of the impasse" through mediation during the first twenty days of impasse.  HRS § 89-11(e) (2012).  If the impasse continues beyond twenty days of the date of impasse, the parties are statutorily required to enter into arbitration pursuant to HRS § 89-11(e)(2).

Section 89-11(a) further provides that parties "may enter, at any time, into a written agreement setting forth an alternate impasse procedure culminating in an arbitration

---

[14]     HRS § 89-2 (2012) defines an "impasse" as a "failure of a public employer and an exclusive representative to achieve agreement in the course of collective bargaining.  It includes any declaration of an impasse under section 89-11."

Relevant to the instant case, under HRS § 89-11(c)(2), "[i]f neither party gives written notice of an impasse and there are unresolved issues on January 31 of a year in which the agreement is due to expire, the board shall declare on January 31 that an impasse exists and February 1 shall be the date of impasse."  Here, the HLRB declared the date of impasse between UPW and the State as February 1, 2009 after the parties initiated negotiations in 2008, but could not reach agreement by January 31, 2009 to renew and modify the CBA that was set to expire on June 30, 2009.

[15]     In other circumstances, when an impasse exists between the public employer and certain noncritical bargaining units, HRS § 89-11 provides that the HLRB "shall assist in the resolution of the impasse" by requiring the parties to engage in mediation, with the HLRB promptly reporting to the appropriate legislative body on the progress of the impasse procedures.  HRS § 89-11(d) (2012).

decision pursuant to subsection (f)[.]"[16]  In addition, "the

alternate impasse procedure shall specify whether the parties

desire an arbitrator or arbitration panel, how the neutral

arbitrator is to be selected or the name of the person whom the

parties desire to be appointed as the neutral arbitrator, and

other details regarding the issuance of an arbitration

decision."  HRS § 89-11(a).  HRS § 89-11(a) further provides

that the "[HLRB] shall permit the parties to proceed with their

procedure and assist at times and to the extent requested by the

parties in their procedure."  In summary, although HRS § 89-11

permits an alternate impasse procedure, the procedure still must

culminate in arbitration consistent with subsection (f), with

the HLRB specifically tasked with overseeing and assisting this

process.

Here, the parties set forth an alternate impasse

procedure in their March 3, 2009 MOA, more than twenty days

after the February 1, 2009 date of impasse.  By the time the

parties entered into the MOA, they were mandated by HRS § 89-

11(e) to enter into an impasse procedure that culminated in

interest arbitration.  The MOA reflects this fact, indicating

---

[16]     Subsection (f) provides specific considerations that the
arbitrator(s) must take into account and include in the arbitration decision.
HRS § 89-11(f) (2012).

that it was entered into "[p]ursuant to subsection 89-11(a), Hawaii Revised Statutes[.]"  The MOA further provided that the arbitration would be conducted according to HRS § 89-11(f), which requires the arbitration panel to expressly consider ten factors in reaching its decision.[17]  Moreover, whereas the

---

[17]  HRS § 89-11(f) provides that:

An arbitration panel in reaching its decision shall give weight to the following factors and shall include in its written report or decision an explanation of how the factors were taken into account:

(1)  The lawful authority of the employer, including the ability of the employer to use special funds only for authorized purposes or under specific circumstances because of limitations imposed by federal or state laws or county ordinances, as the case may be;

(2)  Stipulations of the parties;

(3)  The interests and welfare of the public;

(4)  The financial ability of the employer to meet these costs; provided that the employer's ability to fund cost items shall not be predicated on the premise that the employer may increase or impose new taxes, fees, or charges, or develop other sources of revenues;

(5)  The present and future general economic condition of the counties and the State;

(6)  Comparison of wages, hours, and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours, and conditions of employment of other persons performing similar services, and of other state and county employees in Hawaii;

(7)  The average consumer prices for goods or services, commonly known as the cost of living;

(8)  The overall compensation presently received by the employees, including direct wage compensation, vacation, holidays and excused

(continued…)

parties were mandated to enter into an impasse procedure, the HLRB had the authority and responsibility of overseeing the entire alternate impasse process, under HRS § 89-11(e) and the HLRB's general powers, granted by HRS § 89-5. See HRS § 89-5(i) ("In addition to the powers and functions provided in other sections of this chapter, the board shall: . . . (3) Resolve controversies under this chapter; (4) Conduct proceedings on complaints of prohibited practices by employers, employees, and employee organizations and take such actions with respect thereto as it deems necessary and proper[.]").

When the parties in the instant case brought prohibited practice complaints alleging that the other party had wilfully violated the alternate impasse procedure in the MOA, the HLRB then had exclusive original jurisdiction over the

_____

(continued…)

        time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment, and all other benefits received;

(9)    Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings; and

(10)   Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours, and conditions of employment through voluntary collective bargaining, mediation, arbitration, or otherwise between the parties, in the public service or in private employment.

parties' dispute pursuant to HRS § 89-14.  Under HRS § 89-14,

the HLRB has "exclusive original jurisdiction" over "[a]ny

controversy concerning prohibited practices[.]"  According to

HRS § 89-13, "It shall be a prohibited practice for a public

employer [or bargaining unit representative] wilfully to:

[r]efuse to participate in good faith in the mediation and

arbitration procedures set forth in section 89-11; [r]efuse or

fail to comply with any provision of this chapter; [or]

[v]iolate the terms of a collective bargaining agreement[.]"

HRS § 89-13(a)(6)-(8); id. § 89-13(b)(3)-(5).  Each party

alleged in its prohibited practice complaint that the other

party wilfully violated HRS § 89-13 by refusing to comply with

HRS § 89-11.  The HLRB therefore had exclusive original

jurisdiction over the issues regarding the selection of the

neutral arbitrator, pursuant to HRS § 89-14.

> **2.    The circuit court did not have jurisdiction under
> chapter 658A and this court's decision in HSTA**

UPW nevertheless argues that the circuit court was

required to exert its jurisdiction under chapter 658A and this

court's decision in HSTA, regardless of whether the HLRB also

had jurisdiction under chapter 89.  As UPW notes, HSTA held that

when a circuit court is faced with a motion to compel

arbitration under chapter 658A, the circuit court is limited to

asking if (1) an arbitration agreement exists between the

parties; and if so, (2) whether the subject matter of the dispute is arbitrable under such agreement. UPW insists the ICA and circuit court in the instant case should not have addressed whether the HLRB or the circuit court had jurisdiction; instead, the circuit court should have limited its analysis to the above questions and granted UPW's motion to compel because the MOA was an agreement to arbitrate. UPW's arguments fail because chapter 658A is inapplicable to statutorily mandated arbitration under HRS § 89-11(e). Accordingly, HSTA does not control the instant case.

Chapter 658A was enacted by the legislature in 2001 as a codification of the Revised Uniform Arbitration Act (RUAA). See 2001 Hawai'i Sess. Laws Act 265 §§ 1 and 5 at 810-19, 820. The drafters of the RUAA, the National Conference of Commissioners on Uniform State Laws, made clear that the RUAA was intended to apply to a specific type of arbitration, namely, when parties voluntarily agreed to arbitrate as an alternative to litigation. In their note and commentary to the RUAA, the National Conference of Commissioners explained that, "There are a number of principles that the Drafting Committee agreed upon at the outset of its consideration of a revision to the UAA. First, arbitration is a consensual process in which autonomy of the parties who enter into arbitration agreements should be

44

given primary consideration, so long as their agreements conform to notions of fundamental fairness."  National Conference of Commissioners on Uniform State Laws, Uniform Arbitration Act, Prefatory Note and Comments, 1-2 (December 13, 2000), http://www.uniformlaws.org/shared/docs/arbitration/ arbitration_final_00.pdf (last visited Dec. 30, 2014) (emphasis added); see also Hiro N. Aragaki, Equal Opportunity for Arbitration, 58 UCLA L. Rev. 1189, 1255 (2011) (describing the purpose of the Revised Uniform Arbitration Act as encouraging the conditions under which arbitration will become a "credibl[e]" and "true" alternative to litigation) (quoting RUAA, §§ 6 cmt., 23 cmt. B (2000)).

        In this regard, several provisions in chapter 658A clarify that the chapter applies specifically to a voluntary "agreement to arbitrate" as opposed to statutorily mandated arbitration.  For instance, HRS § 658A-3(a) (Supp. 2002) provides that chapter 658A applies to an "agreement to arbitrate."  Section 658A-26 (Supp. 2001) furthermore provides that "[a] court of this State having jurisdiction over the controversy and the parties may enforce an agreement to arbitrate," and that the "agreement to arbitrate" confers jurisdiction to the circuit court to enter judgment on an award.

45

Indeed, the chair of the RUAA drafting committee has stated that, "Because RUAA only [sic] applies only where there is an agreement to arbitrate, arbitrations prescribed and required by state statute are not covered by RUAA.  Thus, statutory labor arbitrations and lemon law arbitrations, and other such statutory arbitrations are not covered."  Francis J. Pavetti, The Revised Uniform Arbitration Act (RUAA) 2, http://www.uniformlaws.org/Shared/Docs/RUAA%20Briefing%20Sheet_v 2_030508.pdf (last visited Dec. 30, 2014) (emphases added).  The RUAA drafting committee chair thus drew a sharp line between statutorily mandated arbitration, and an agreement to arbitrate, and stated unequivocally that the RUAA applies to agreements to arbitrate but not to arbitration mandated by statute.  Reiterating this point yet again, the committee chair stated that, "One of the cornerstones of party autonomy in RUAA is the requirement that RUAA only applies if there is an agreement to arbitrate."  Francis J. Pavetti, Why the States Should Enact the Revised Uniform Arbitration Act, 3 Pepp. Disp. Resol. L.J. 443, 444 (2003).[18]  In this regard, the "RUAA does not apply to

---

[18]    See also Francis J. Pavetti, Policy Statement:  Revised Uniform Arbitration Act (RUAA), Uniform Law Commission (May 15, 2000), http://www.uniformlaws.org/shared/docs/arbitration/arbpswr.pdf (last visited Dec. 30, 2014).

statutorily mandated arbitrations not requiring an arbitration agreement." Id. at 444 n.4.

In adopting chapter 658A, the legislature stated that its intent was to "codify[] the [Revised] Uniform Arbitration Act[,]" so as to advance the public policy of promoting "arbitration [as] a desirable alternative to litigation[.]" H. Stand. Comm. Rep. No. 189, in 2001 House Journal, at 1204. There is no indication in the legislative history that the legislature intended to expand the RUAA's reach beyond cases involving agreements to arbitrate. Given the above, chapter 658A does not cover the statutorily mandated arbitration at issue here, and thus is inapplicable in the instant case.

The State argues that this court's definition of a valid agreement to arbitrate also indicates that the statutorily mandated arbitration in the instant case is not an "agreement to arbitrate" conferring jurisdiction on the circuit court within the meaning of chapter 658A. In Douglass v. Pflueger Hawaii, Inc., 110 Hawai'i 520, 531, 135 P.3d 129, 140 (2006), this court held that a valid agreement to arbitrate consists of the following: "(1) it must be in writing; (2) it must be unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) there must be bilateral consideration." (Citing Brown v. KFC Nat'l Mgmt. Co., 82 Hawai'i 226, 238–40, 921

P.2d 146, 158-60 (1996)).  The State contends that the MOA fails to satisfy the third requirement of bilateral consideration.  "Under the preexisting duty rule, it is well settled that doing what one is legally bound to do is not consideration for a new promise."  Yerkovich v. AAA, 610 N.W.2d 542, 546 (Mich. 2000); see also Egan v. St. Anthony's Med. Ctr., 244 S.W.3d 169, 174 (Mo. 2008) (holding that a hospital's duty to conform to health regulations is a preexisting duty that cannot furnish consideration for a contract); McCallum Highlands, Ltd. v. Washington Capital Dus, Inc., 66 F.3d 89, 93 opinion corrected on denial of reconsideration, 70 F.3d 26 (5th Cir. 1995) ("[U]nder the 'pre-existing duty rule,' an agreement to do what one is already bound to do cannot serve as 'sufficient consideration to support a supplemental contract or modification.'") (citation omitted).  Here, the parties agreed to the MOA on March 3, 2009, after their statutory obligation to arbitrate was triggered by the passage of twenty days from the February 1, 2009 date of impasse.  See HRS § 89-11(e)(2) ("If the impasse continues twenty days after the date of impasse, the [HLRB] shall immediately notify the employer and the exclusive representative that the impasse shall be submitted to a three-member arbitration panel who shall follow the arbitration procedure provided herein.").  Thus, according to the State,

48

under the preexisting duty rule, the MOA was not a valid
agreement to arbitrate because there was no bilateral
consideration.

In response, UPW argues that the MOA was a voluntary
agreement to arbitrate because, "If some bilateral consideration
went into the overall MOA, then a requirement of bilateral
consideration is satisfied" as to the agreement to arbitrate.
UPW's argument is unavailing because the parties' agreement to
other terms in the MOA does not convert a statutorily mandated
arbitration into a voluntary agreement to arbitrate.[19]  Notably,

_____

[19]    Cases in other jurisdictions have remarked on the significant
difference between voluntary agreements to arbitrate and statutorily mandated
arbitration.  For example, in Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell,
882 P.2d 511, 516 (N.M. 1994), the New Mexico Supreme Court stated,
"Normally, arbitration is a process in which parties voluntarily contract to
select an impartial third person--an arbitrator--to whom they refer their
dispute for a decision based on evidence and arguments before the arbitration
tribunal, in order to obtain a speedy and inexpensive final resolution of the
dispute. . . . When arbitration is statutorily mandated as the sole method
for resolution of a particular dispute, the arbitration is not consensual
even if a provision for such arbitration is incorporated into a contract.
Arbitration required by statute is compulsory; arbitration freely entered
into by contract is voluntary."  Id. at 517.  As the New York Court of
Appeals has observed,

> the essence of arbitration, as traditionally used and
> understood, is that it be voluntary and on consent.
> The introduction of compulsion to submit to this
> informal tribunal is to change its essence.  It is
> very easy to transfer, quite fallaciously, notions
> and principles applicable to voluntary arbitration to
> "compulsory" arbitration, because, by doubtful logic
> but irresistible usage, both systems carry the
> descriptive noun "arbitration" in their names.  The
> simple and ineradicable fact is that voluntary
> arbitration and compulsory arbitration are
> fundamentally different if only because one may,
> under our system, consent to almost any restriction
> upon or deprivation of right, but similar

(continued…)

none of the cases cited to by UPW involved statutorily mandated arbitration.  Vickery v. Hastert, No. 28586 (Haw. App. Feb. 13, 2009) (mem.); Barker v. Golf U.S.A., Inc., 154 F.3d 788, 790 (8th Cir. 1998); Doctor's Associates, Inc. v. Distajo, 66 F.3d 438, 442 (2d Cir. 1995); Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp., 878 F.2d 167, 168 (6th Cir. 1989); Sablosky v. Edward S. Gordon Co., Inc., 535 N.E.2d 643 (N.Y. 1989); Avid Eng'g, Inc. v. Orlando Marketplace Ltd., 809 So. 2d 1, 2 (Fla. Dist. Ct. App. 2001).  Instead, every case cited to by UPW involved commercial contracts in the private sector, and specifically considered the issue of whether consideration in a commercial contract made an arbitration clause in the same contract enforceable.  Moreover, as the court in Distajo explained, the reason that courts have held that a commercial arbitration clause does not have to be supported by independent consideration was because "recent decisions of the Supreme Court have consistently emphasized that the [Federal Arbitration Act] is grounded in a strong federal policy favoring arbitration.  A

_____

(continued…)
> restrictions or deprivations, if compelled by government, must accord with procedural and substantive due process.

Mount St. Mary's Hosp. of Niagara Falls v. Catherwood, 260 N.E.2d 508, 511 (N.Y. 1970) (citation omitted); see Harrell, 882 P.2d 511, 517 (holding that "[defendant's] putative agreement to arbitrate was in reality a nonconsensual submission to a statutorily imposed requirement of mandatory arbitration").

doctrine that required separate consideration for arbitration clauses might risk running afoul of that policy."  66 F.3d at 453 (citation omitted).  The reasoning behind the holdings cited to by UPW was to prevent parties from avoiding arbitration by arguing that their agreements to arbitrate lacked consideration. That reasoning is inapplicable here, where arbitration is required by statute and where both parties do not dispute the necessity of arbitration.  Although consideration as to other terms in an agreement may make an arbitration clause in a commercial contract enforceable, it does not transform a statutorily mandated arbitration into a voluntary agreement to arbitrate.  The MOA was an agreement to the terms of the alternate impasse procedure, but did not alter the underlying fact that arbitration was required by HRS § 89-11(e).

In fact, UPW goes so far as to argue that, "whether by alternate procedures or statutory procedures, an agreement to arbitrate exists giving the circuit court jurisdiction under Chapter 658A, HRS."  UPW thus claims that, even if the parties did not opt for an alternate impasse procedure set forth in an MOA, and instead followed the impasse process laid out in HRS § 89-11(d), that process culminating in mandatory arbitration would be an agreement to arbitrate conferring jurisdiction to the circuit court under chapter 658A.  No explanation is

51

provided by UPW to support this expansive contention, although the argument suggests that, in UPW's view, any form of arbitration constitutes an agreement to arbitrate. Such a view does not accord with chapter 658A's recognition of voluntary arbitration as fundamentally different from statutorily mandated arbitration.

UPW's view also does not accord with the statutory scheme set forth in chapter 89 and discussed in the previous section. That scheme recognized that arbitration in HRS § 89-11 requires particular oversight by the HLRB because of the significant financial impact such arbitration could and has had on the State and counties. To reiterate, HRS § 89-11(d) imposes strict criteria for the arbitrator to consider when rendering an award pursuant to HRS § 89-11. In 2000, when the legislature overhauled large portions of chapter 89, it also instituted stricter criteria for what arbitrators could and must consider when rendering a decision in an HRS § 89-11 arbitration. "[T]o correct the abuse of the arbitration process" that led to arbitration awards significantly impacting the State budget, see 2000 House Journal, at 746 (statement of Rep. Case), the Governor and the House even proposed that mandatory arbitration under HRS § 89-11 should be abolished for all collective bargaining units but the police and firefighters, and that the

right to strike be reinstated, see 2000 House Journal, at 746 (statement of Rep. Case); H. Stand. Comm. Rep. No. 1344-00, in 2000 House Journal, at 1522 ("The cost implications of mandatory arbitration, which is final and binding under section 89-11, HRS, have played a major role in the economics of the State. Arbitrators play a vital part in arbitrating disputes over cost items, with little restraint over imposing awards and no regard to the ability of the employer to pay.").  The legislature rejected that option, instead electing to:

> Amend[] criteria for arbitration decisions, to restrict from the arbitrator's consideration of the employer's ability to pay, potential revenue resources such as the imposition of increased or new taxes and fees and receipt of judgments and settlements, and any revenue estimates exceeding those by the Council of Revenues, and to remove from consideration the broad catchall provision of other factors that are normally or traditionally taken into consideration in voluntary agreements between parties in public service or private employment.

S. Stand. Comm. Rep. No. 2686, in 2000 Senate Journal, at 1104.

Significantly, this statement by the legislature, when viewed in the context of the statutory scheme, indicates that it recognized HRS § 89-11 arbitration as not only distinct from "voluntary agreements between parties," i.e., voluntary agreements to arbitrate, but also requiring stricter control and oversight, given the financial ramifications such awards have on the State and counties.  Although UPW argues the circuit court had jurisdiction under chapter 658A because arbitration was

involved, it is clear from the statutory scheme of chapter 89 that the legislature's mandate to the HLRB "to administer the provisions of chapters 89," HRS § 89-1, also included oversight of the arbitration process itself. Allowing a party to remove an HRS § 89-11(e) arbitration from the HLRB's jurisdiction to the circuit court would countermand the government's substantial interest in, and chapter 89's clear preference for, having an agency with expertise over the area in question responsible for overseeing the entire impasse process. Nor does this statutory scheme intrude on chapter 658A because the HLRB's exercise of jurisdiction over HRS § 89-11(e) arbitration would not conflict with chapter 658A's specific application to voluntary agreements to arbitrate as opposed to statutorily mandated arbitration.

In light of chapter 658A's inapplicability to the arbitration here, HSTA does not control the instant case, contrary to what UPW contends. In HSTA, the public employer, University Lab School (ULS), and the union representative, HSTA, negotiated a supplemental agreement concerning the salaries of ULS's Unit 5[20] employees. 132 Hawaiʻi at 428, 322 P.3d at 968. HSTA notified ULS that a "step placement chart" had been

---

[20] HRS § 89-6 provides that bargaining unit 5 employees consist of "Teachers and other personnel of the department of education under the same pay schedule, including part-time employees working less than twenty hours a week who are equal to one-half of a full-time equivalent[.]"

54

"inadvertently omitted" from the agreement and should be included.  Id.  ULS denied having agreed to the terms of the chart.  Id.

The parties' supplemental agreement contained an arbitration provision to resolve grievances.  Id. at 428 n.3, 322 P.3d at 968 n.3.  Relying on this provision, HSTA contended the dispute was a grievance and requested arbitration.  Id. at 428-29, 322 P.3d at 968-69.  ULS contested HSTA's request to arbitrate, and insisted the issue was a bargaining dispute governed by HRS § 89-10.8(a)(1)[21] rather than a grievance subject to the parties' arbitration agreement.  Id. at 432, 322 P.3d at 972.  ULS subsequently filed a prohibited practice complaint with the HLRB that alleged that HSTA violated HRS § 89-10.8(a)(1) by attempting to use the grievance process to alter the supplemental agreement.  Id. at 429, 322 P.3d at 969.  HSTA responded by filing a special proceeding in the circuit court to compel arbitration of its grievance pursuant to HRS § 658A-7.[22]

---

[21]     HRS § 89-10.8 (2012) governs the "Resolution of disputes; grievances" and provides:  "A public employer shall enter into written agreement with the exclusive representative setting forth a grievance procedure culminating in a final and binding decision, to be invoked in the event of any dispute concerning the interpretation or application of a written agreement."  However, HRS § 89-10.8(a)(1) clarifies that "[a] dispute over the terms of an initial or renewed agreement" is not a grievance.

[22]     HRS § 658A-7 (Supp. 2001) provides:

(continued…)

Id.  The circuit court denied the HSTA's motion to compel arbitration, concluding that the HLRB had primary jurisdiction because the issues raised involved prohibited practices.  Id.  The ICA affirmed on the same grounds.  Id. at 430-31, 322 P.3d at 969-70.  This court vacated the ICA's and circuit court's respective judgments.  Id. at 433, 322 P.3d at 973.

In vacating the ICA, this court reasoned that "[t]he ICA erred in stating that pursuant to the parties' agreements, and HRS § 89-10.8, the circuit court may only order arbitration after finding that a grievance exists."  Id. at 432, 322 P.3d at 972.  Additionally, this court concluded that "[i]t is immaterial whether this case involves a 'grievance' or a 'dispute over the terms of an initial or renewed agreement'" because, under HRS §§ 658A-6(b)-(c), "the [circuit] court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate" and "an arbitrator

_____
(continued…)

    (a)   On motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement:

    (1)   If the refusing party does not appear or does not oppose the motion, the court shall order the parties to arbitrate; and

    (2)   If the refusing party opposes the motion, the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate.

shall decide whether a condition precedent to arbitrability has been fulfilled and whether a contract containing a valid agreement to arbitrate is enforceable." Id. at 430-32, 322 P.3d at 970-72 (brackets omitted). Thus, HSTA provided that, when a circuit court is faced with a motion to compel arbitration under chapter 658A, "the court is limited to answering two questions: 1) whether an arbitration agreement exists between the parties; and 2) if so whether the subject matter of the dispute is arbitrable under such agreement." Id. at 430, 322 P.3d at 970 (quoting Koolau Radiology, Inc. v. Queen's Med. Ctr., 73 Haw. 433, 445, 834 P.2d 1294, 1300 (1992)). Therefore, "[t]he ICA need not have reached the issue of the HLRB's possible primary jurisdiction over this dispute" because "the only issue before the circuit court was whether an arbitration agreement between the HSTA and the ULS existed." Id. at 433, 322 P.3d at 973.

HSTA is distinguishable because it involved a voluntary agreement to arbitrate a grievance as opposed to statutorily mandated interest arbitration. Whereas the union in HSTA sought to compel arbitration pursuant to a voluntary agreement to arbitrate, here, the arbitration was statutorily mandated by HRS § 89-11(e). As discussed below, although chapter 658A confers jurisdiction to the circuit court to compel voluntary "agreements to arbitrate," chapter 658A does not

57

confer jurisdiction over a statutorily mandated arbitration pursuant to HRS § 89-11(e).  As a result, it was proper for the circuit court in this case to deny UPW's motion to compel arbitration.[23]

UPW contends that <u>HSTA</u> is indistinguishable on this ground because "an agreement to arbitrate a rights arbitration [under HRS § 89-10.8[24]] mirrors a legal obligation to arbitrate"

---

[23]     Notably, the motion to compel arbitration was unnecessary, given that HRS § 89-11(e) already required arbitration in the instant case once the parties had failed to resolve their impasse within twenty days after it was declared.  HRS § 89-11(e)(2).  Moreover, neither party disputed the need to arbitrate the CBA.

[24]     HRS § 89-10.8 provides:

(a) A public employer shall enter into written agreement with the exclusive representative setting forth a grievance procedure culminating in a final and binding decision, to be invoked in the event of any dispute concerning the interpretation or application of a written agreement.  The grievance procedure shall be valid and enforceable and shall be consistent with the following:

(1)   A dispute over the terms of an initial or renewed agreement shall not constitute a grievance;

(2)   No employee in a position exempted from chapter 76, who serves at the pleasure of the appointing  authority, shall be allowed to grieve a suspension or discharge unless the collective bargaining agreement specifically provides otherwise; and

(3)   With respect to any adverse action resulting from an employee's failure to meet performance requirements of the employee's position, the grievance procedure shall provide that the final and binding decision shall be made by a performance judge as provided in this section.

(continued…)

under HRS § 89-11(e).  This is incorrect.  Section 89-10.8 is distinguishable from HRS § 89-11 because it does not obligate parties to enter into arbitration.  Nor did HRS § 89-10.8 obligate the parties to arbitrate the grievance in HSTA. Section 89-10.8 requires the parties to "enter into written agreement with the exclusive representative setting forth a grievance procedure culminating in a final and binding decision, to be invoked in the event of any dispute concerning the interpretation or application of a written agreement."  Although parties may agree to an arbitrator rendering the final and

_____
(continued…)

> (b) The performance judge shall be a neutral third party selected from a list of persons whom the parties have mutually agreed are eligible to  serve as a performance judge for the duration of  the collective bargaining agreement.  The parties, by mutual agreement, may modify the performance judge list at any time and shall determine a process for selection from the list.
>
> (c) The performance judge shall use the conditions in section 76-41(b) as tests in reaching a decision on whether the employer's action, based on a failure by the employee to meet the performance requirements of the employee's position, was with or without merit.
>
> (d) If it is alleged that the adverse action was not due to a failure to meet performance requirements but for disciplinary reasons without just and proper cause, the performance judge shall first proceed with a determination on the merits of the employer's action under subsection (c).  If the performance judge determines that the adverse action may be based on reasons other than a failure to meet performance requirements, the performance judge shall then determine, based on appropriate standards of review, whether the disciplinary action was with or without proper cause and render a final and binding decision.

binding decision, the statutory provision does not preclude the parties from agreeing to a grievance procedure in which the final and binding decision is determined in a court of law. HRS § 89-10.8. Were arbitration required under HRS § 89-10.8, the statutory provision would have explicitly said so. However, arbitration is never mentioned in HRS § 89-10.8, unlike in HRS § 89-11(e).

Moreover, to the extent the performance judge[25] in HRS §§ 89-10.8(a)(3), (c)-(d) can be interpreted as an arbitrator, the performance judge is only required to determine grievances "[w]ith respect to any adverse action resulting from an employee's failure to meet performance requirements of the employee's position[.]" HRS § 89-10.8(a)(3). HSTA did not involve this type of grievance. HSTA instead involved a dispute over the interpretation and application of a written agreement. 132 Hawai'i at 428-29, 322 P.3d at 968-69. UPW's attempts to argue that HSTA controls the instant case are, therefore, without merit.

---

[25] The performance judge is a neutral third party who adjudicates grievances that arise when a public employer takes an adverse action against an employee for failing to meet the performance requirements of the employee's position. See HRS §§ 89-10.8, 76-41 (Supp. 2000). According to HRS § 76-41(a), "'performance requirements' includes any qualification required for the position such as a license."

60

Given the above, chapter 658A was inapplicable to the arbitration in the instant case.[26]  Because UPW's motion to compel arbitration was brought pursuant to chapter 658A, it was proper for the court to deny the motion for lack of subject matter jurisdiction.

Furthermore, the circuit court's lack of jurisdiction means that the doctrine of primary jurisdiction is inapplicable. As this court stated in United Pub. Workers, AFSCME, Local 646, AFL-CIO v. Abercrombie, 133 Hawai'i 188, 197, 325 P.3d 600, 609 (2014), the doctrine of primary jurisdiction applies "where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."

---

[26]  HRS § 658A-1 (Supp. 2006) appears to contemplate that the circuit court has jurisdiction over some types of arbitration subject to chapter 89. Section 658A-1 defines "Court" to mean "any district or circuit court of competent jurisdiction in this State, unless otherwise indicated.  In cases involving arbitration subject to chapter 89, chapter 377, or the National Labor Relations Act, 'court' means the circuit court of the appropriate judicial circuit."  This does not indicate, however, that chapter 658A confers jurisdiction to the circuit court over all arbitrations implicating chapter 89.  As HSTA showed, a public employer and union representative could enter into a voluntary agreement to arbitrate that concerns a CBA under chapter 89, but does not implicate the impasse procedures under HRS § 89-11(e).  Indeed, a public employer and representative of a noncritical bargaining unit may resolve an impasse through a voluntary agreement to arbitrate under HRS § 89-11(d).  For instance, HRS § 89-11(d)(4) provides that, "After the fiftieth day of impasse, the parties may resort to such other remedies that are not prohibited by any agreement pending between them, other provisions of this chapter, or any other law."  If the parties then reach a voluntary agreement to arbitrate, as permitted by HRS § 89-11(d)(4), such an agreement could be subject to chapter 658A.

(Quoting <u>Kona Old Hawaiian Trails Group v. Lyman</u>, 69 Haw. 81, 93, 734 P.2d 161, 168 (1987) (emphasis added)).  Primary jurisdiction thus applies when the circuit court and an administrative agency both possess original jurisdiction over the same claim.  However, here, the doctrine is inapplicable because the circuit court lacked jurisdiction over the arbitration under chapter 658A.  Therefore, the primary jurisdiction doctrine is not necessary to resolve whether the HLRB or the circuit court was the proper forum in which to adjudicate the arbitration dispute.

In this regard, the ICA erred in relying on HRS § 89-19 to resolve the jurisdictional dispute.  The ICA stated that it "need not resolve the question of whether HRS Chapter 658A applies to interest arbitrations under HRS Chapter 89" because "the exclusive original jurisdiction granted to the HLRB over controversies concerning prohibited practices by HRS § 89-14 would supersede HRS Chapter 658A."  In reaching this conclusion, the ICA cited to HRS § 89—19, which states that chapter 89 "shall take precedence over all conflicting statutes concerning this subject matter and shall pre-empt all contrary local ordinances, executive orders, legislation, or rules adopted by the State[.]"  Yet, because the arbitration was statutorily mandated arbitration pursuant to HRS § 89-11(e), and not a

voluntary "agreement to arbitrate," the circuit court did not have jurisdiction pursuant to chapter 658A.  In other words, the ICA did not need to rely on HRS § 89-19 to resolve whether chapter 89 or chapter 658A would control because chapter 658A was inapplicable.

**D.    The circuit court lacked jurisdiction to determine UPW's motion for civil contempt**

UPW argues the ICA erred in concluding that the circuit court lacked jurisdiction to consider UPW's motion for show cause order and for civil contempt.  According to UPW, "the circuit court had jurisdiction to consider the motion to show cause" under HRS § 658A-25(a) (Supp. 2001).[27]  However, because the circuit court did not have jurisdiction over the arbitration, it lacked jurisdiction to decide UPW's motion for show cause order.

UPW does not dispute that it brought its motion to show cause to enforce the circuit court's order granting UPW's motion to confirm the arbitration award.  Nor does UPW dispute that its motion to confirm the arbitration award was brought pursuant to chapter 658A.  According to the motion, UPW "move[d]

---

[27]     HRS § 658A-25(a) provides that, "Upon granting an order confirming, vacating without directing a rehearing, modifying, or correcting an award, the court shall enter a judgment in conformity therewith.  The judgment may be recorded, docketed, and enforced as any other judgment in a civil action."

pursuant to Section 658A-22, Hawaii Revised Statutes (HRS), for confirmation and enforcement of an arbitration decision and award dated January 14, 2010, for entry of a judgment in conformity with an order confirming the award pursuant to Section 658A-25(a), HRS[.]"  After the circuit court granted UPW's motion, UPW then moved the circuit court to order the State "to show cause why [it] should not be held in civil contempt for disobeying the Court's May 18, 2010 order granting the UPW's motion to confirm and to enforce arbitration award[.]"  However, as discussed above, the circuit court did not have jurisdiction over the interest arbitration under chapter 658A. Therefore, the circuit court lacked jurisdiction to consider UPW's motion to confirm the arbitration award, as well as its motion for show cause order.

UPW contends that it was deprived of a statutory means to enforce the award through a motion for show cause order and for civil contempt.  Although "[c]onfirmation of an arbitration award is an expeditious procedure for reducing or converting the arbitration award to a judgment which can be enforced by judicial writ[,]" Mikelson v. United Servs. Auto. Ass'n, 122 Hawai'i 393, 395, 227 P.3d 559, 561 (App. 2010) (citations and quotation marks omitted), the circuit court's lack of jurisdiction in this case does not deprive UPW of a statutory

means to enforce the arbitration award under chapter 89.

Section 89-11(g) (Supp. 2004) provides that "[t]he decision of

the arbitration panel shall be final and binding upon the

parties on all provisions submitted to the arbitration panel."

Section 89-11(g) requires that "[t]he parties shall take

whatever action is necessary to carry out and effectuate the

final and binding agreement[,]" set forth in the arbitration

decision.  If a party does not comply with this requirement to

carry out the arbitration decision, the aggrieved party can

bring a prohibited practice complaint under HRS chapter 89,

including HRS §§ 89-13(a)(6) or (b)(3) for "[r]efus[ing] to

participate in good faith in the mediation and arbitration

procedures set forth in section 89-11"; and HRS §§ 89-13(a)(7)

or (b)(4) for "[r]efus[ing] or fail[ing] to comply with any

provision of this chapter[.]"  The HLRB, upon finding that a

party has committed a prohibited practice by not complying with

the arbitration award, "may require the respondent to do any or

all of the following:  to cease and desist from the prohibited

practice found to have been committed; to suspend the

respondent's rights, immunities, privileges, or remedies granted

or afforded by chapter 89, HRS, for not more than one year; or

to require the respondent to take such affirmative action as

will effectuate the purpose of chapter 89, HRS . . . [.]"  HAR

§ 12-42-50 (effective 1981-2014).  In the event a party does not abide by the HLRB's order to enforce the award, the HLRB can petition the circuit court "for the enforcement of the order and for appropriate temporary relief or restraining order . . . [.]" HAR § 12-42-51 (effective 1981-2014).  Any party disagreeing with the HLRB's decision relating to the enforcement of an arbitration award may also file an administrative appeal in the circuit court of the HLRB's decision pursuant to HRS § 91-14 (Supp. 2004).  In light of the extensive administrative remedies available under chapter 89, and the right to an administrative appeal under HRS § 91-14, the statutory scheme set forth in chapter 89 provides participants in the impasse procedure with sufficient means to enforce an HRS § 89-11 arbitration award.

Accordingly, the ICA was correct to conclude that the circuit court's order denying UPW's motion for civil contempt should be vacated for lack of subject matter jurisdiction.[28]

---

[28] It appears the ICA relied on its jurisdictional analysis in part II.B. of its opinion, which, as discussed supra, is erroneous to the extent that it presumes the circuit court had jurisdiction under chapter 658A and that the HLRB's exclusive original jurisdiction prevails because of HRS § 89-19.  Nevertheless, the ICA was correct to conclude that the circuit court lacked jurisdiction to decide the motion for show cause order.  See Strouss v. Simmons, 66 Haw. 32, 40, 657 P.2d 1004, 1010 (1982) ("An appellate court may affirm a judgment of the lower court on any ground in the record which supports affirmance.").

**E.    The HLRB had the authority to select the neutral arbitrator**

UPW argues that the HLRB exceeded its authority by ordering the AAA to appoint the neutral arbitrator. Specifically, UPW contends the HLRB could not fashion a remedy beyond what was contemplated by the parties' MOA, which set forth that the neutral arbitrator would be selected by having the parties alternately strike names from an AAA list until a single name was left.  Contrary to UPW's contentions, the HLRB had the authority to fashion such a remedy and under the circumstances did not abuse its discretion in ordering such a remedy.

Section 89-5(i)(4) grants the HLRB broad authority regarding prohibited practice complaints.  Section 89-5(i)(4) provides that the HLRB shall "[c]onduct proceedings on complaints of prohibited practices by employers, employees, and employee organizations and take such actions with respect thereto as <u>it deems necessary and proper</u>[.]"  (Emphasis added). Moreover, under HAR § 12-42-71 (effective 1981-2014), which governs the selection and certification of an arbitration panel during an HRS § 89-11 impasse, "[i]f either the public employer or exclusive bargaining representative fails to select an arbitrator within three days after the filing of the arbitration notification, the board shall select an arbitrator from the

67

register of arbitrators."  See State v. Kotis, 91 Hawaiʻi 319, 331, 984 P.2d 78, 90 (1999) ("Administrative rules, like statutes, have the force and effect of law.") (citing State v. Kirn, 70 Haw. 206, 208, 767 P.2d 1238, 1239-40 (1989)).

In addition to the HLRB's express powers, it is also "well established that an administrative agency's authority includes those implied powers that are reasonably necessary to carry out the powers expressly granted."  Morgan v. Planning Dep't, Cnty. of Kauai, 104 Hawaiʻi 173, 184, 86 P.3d 982, 993 (2004).  Indeed, in Del Monte Fresh Produce (Hawaii), Inc. v. International Longshore & Warehouse Union, Local 142, AFL-CIO, 112 Hawaiʻi 489, 506, 146 P.3d 1066, 1083 (2006), this court stated that the "as the board may deem proper" phrase in then-HRS § 377-9(d), "show[ed] that the Hawaiʻi legislature empowered the HLRB with discretion to determine appropriate remedies for the commission of unfair labor practices."

In the instant case, the remedy provided by the HLRB, i.e., ordering the AAA to select the neutral arbitrator, was not an abuse of discretion.  As the ICA noted, "[t]he purpose of HRS § 89-11 is to facilitate the timely resolution of an impasse in negotiations over collective bargaining agreements[,]" and time was of the essence given that the prior CBA had expired on June 30, 2009.  As discussed supra, despite the necessity of

resolving the impasse quickly, the parties continued to delay the selection of the neutral arbitrator.

Specifically, although the parties agreed to select the neutral arbitrator within five days of receiving the AAA list on July 17, 2009, they mutually agreed to extend the date to July 28, 2009.  During this period, the parties could not select the neutral arbitrator.  From July 15, 2009 to July 28, 2009, the State's bargaining representative, Laderta, repeatedly attempted to contact UPW's bargaining representative, Nakanelua, but according to Laderta, Nakanelua would not return Laderta's calls.  Then, on July 28, 2009, UPW's counsel, Takahashi, informed the State that he would be representing UPW in the selection.  The parties took more time by conducting their communications through letter.  Only after Halvorson, the State's counsel, requested the HLRB's assistance, did the parties begin to strike names off the AAA list.  However, the parties only managed two strikes by August 20, 2009, before filing prohibited practice complaints against each other. Because of the parties' conduct, none of the five arbitrators could be scheduled for the date set by the MOA for the arbitration, September 11, 2009.  The HLRB thus found that both parties had been responsible for the "undue delay" in the selection of the neutral arbitrator.  Indeed, by the time the

HLRB entered its September 25, 2009 order for interlocutory relief, the parties had allowed the CBA to expire for over three months without negotiating a renewal.  Given these circumstances, the HLRB did not abuse its discretion in ordering the AAA to select the neutral arbitrator from the remaining three names on the AAA list.

### IV.  Conclusion

The ICA's April 4, 2014 judgment on appeal is affirmed, as clarified by this opinion.

Rebecca L. Covert
and Davina W. Lam
for petitioner

Nelson Y. Nabeta
for respondent
State of Hawaiʻi

Sarah Hirakami
for respondent HLRB

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Richard W. Pollack

/s/ Michael D. Wilson

/s/ Rom A. Trader

